Filed 3/16/26

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ANDREW B. CLAPKIN et al., | B340606 |
| Cross-complainants and Appellants, | (Los Angeles County Super. Ct. No. 24STCV02330) |
| v. | |
| SHANA LEVIN et al., | |
| Cross-defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Daniel M. Crowley, Judge.  Affirmed; dismissed.

Ervin Cohen & Jessup, Robert M. Waxman, Jason L. Haas, and Elliot Z. Chen for Cross-complainants and Appellants.

Greenberg Glusker Fields Claman & Machtinger, Gregg A. Martin and Ann S. Lee; Klapach & Klapach and Joseph S. Klapach for Cross-defendants and Appellants.

———————————

# INTRODUCTION

In this case, one of at least nine so far between two sets of cousins, Shana Levin and Tamara Levin (the Levins) appeal from an order denying their motion under Code of Civil Procedure section 425.16 to strike four causes of action in a cross-complaint filed by Andrew Clapkin, Dina Marshall, Marci Clapkin Weiser, and Karen Callan (the Clapkins).[1]  Though the Clapkins' cross-complaint mentions the Levins' conduct in some of the other actions,  the Clapkins' causes of action arise from their underlying dispute with the Levins, not from the Levins' protected litigation activity.  Therefore, we affirm the order denying the Levins' special motion to strike.  We also dismiss the Clapkins' appeal from a nonappealable order denying their motion for attorneys' fees under section 425.16, subdivision (c).

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Levins and the Clapkins Own Shares in a Family-run Corporation*

The Levins and the Clapkins are shareholders in JosLevin Realty Corp. of L.A. (JLR), a closely held, family corporation that owns industrial real estate.  In the early 1990s Martin Levin, the Levins' and Clapkins' grandfather, owned all of JLR's shares.  Martin gave his shares in equal portions to his three children, Sheila Clapkin, Michael Levin, and Ronald Levin.  After Ronald transferred his shares back to Martin, Martin distributed those

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

2

(i.e., Ronald's) shares equally among Sheila, Michael, and Martin's seven grandchildren: Michael's children (the two Levins) and Sheila's children (the four Clapkins and their sister Sheri Clapkin, the one grandchild not a party to this internecine litigation).[2] Sheila transferred her shares into a trust that named Sheila and her husband as trustees and their five children as successor cotrustees and beneficiaries.

Michael played an active role in JLR until 2009, when Andrew became more involved. Andrew managed JLR's business operations with the help of two employees, Andrew's husband and Dina's husband. In 2020 Andrew became president of JLR.

In 2009 the Levins disagreed with the Clapkins about whether JLR should acquire new properties or, as the Levins preferred, distribute profits to shareholders. At the 2011 annual shareholders' meeting the Levins announced they were abstaining from the election and walked out. The Levins did not attend or vote at another annual shareholders' meeting until 2022.

In February 2022 Michael died, and Shana and Tamara inherited his shares. At that time Sheila's trust was JLR's largest shareholder, with a 37 percent interest, followed by Shana and Tamara (each with 22.2 percent), and the five Clapkin children (each with 3.7 percent).

---

[2]     We refer to the four cross-complainants as the Clapkins and the five Clapkin siblings as the Clapkin children, i.e., {Clapkins} ⊂ {Clapkin children}.

3

B.   *The Levins and the Clapkins Clash over Control of JLR; the Levins-Clapkins Feud Moves to Court*

At JLR's annual shareholder meeting in February 2022 Shana, Dina, and Marci were elected as directors, and the directors appointed Shana as president. During the meeting Tamara had the locks changed at JLR's corporate office, and the Levins refused to give keys to the Clapkins. After the meeting Shana hired outside advisors, fired Andrew and the other two employees, and limited the Clapkins' access to JLR's records. In June 2022 Dina and Marci voted to remove Shana as president and to appoint Marci as president. The Levins, however, refused to accept the results of the election. Between June and September 2022 the Levins and the Clapkins filed the first four actions against each other, including a wrongful termination action by Andrew and a shareholder derivative action by the Levins.

C.   *The Levins Dispute the Clapkins' Right To Vote the Trust's Shares*

In October 2022 Sheila's husband resigned "with respect only to the Trust's interest in" JLR. In November 2022 Sheila's physicians declared her incapacitated due to Parkinson's disease dementia. The Clapkins contended that, because Sheila was incapacitated and her husband had resigned as trustee, under the terms of the trust the Clapkin children became successor cotrustees of Sheila's trust. In November 2022 the Clapkins voted 51.8 percent of JLR's shares (the trust's 37 percent, plus their 14.8 percent (3.7 x 4)) to wind up and dissolve JLR. The Clapkins also filed a petition for judicial supervision and appointment of a receiver (the fifth action between the cousins).

4

The Levins disputed the Clapkins' authority to vote the trust's shares and opposed dissolving JLR. They contended the transfer of shares from Sheila as trustee to the Clapkin children as successor cotrustees violated JLR's buy-sell agreement, which Sheila, Michael, and Ronald executed in 1994 "to establish consistent and harmonious policies and to assure continuity of management by persons who have a proprietary interest in" JLR. To further its stated purpose of providing "for the purchase of the Shares of a Shareholder following the death of such Shareholder and on the occurrence of certain other events," paragraph 2.1 of the buy-sell agreement limits a shareholder's ability to transfer JLR shares "other than to the Corporation or to the other Shareholders." The agreement states that, "[n]otwithstanding Paragraph 2.1," a shareholder may transfer shares to his or her "immediate family" or to "a revocable inter vivos trust for the transferring Shareholder's benefit and in which the transferring Shareholder continues to maintain control of the transferred Shares in his or her capacity as a trustee of said trust, so long as the transferring Shareholder retains in his or her individual capacity the voting power connected with the Shares so transferred."

The Levins argued the provision regarding transfers to a trust meant "no one other than Sheila" could vote the trust's shares. They also argued Sheila's "purported transfer of the 'voting power' connected with" her shares was, under the terms of the buy-sell agreement, "void and ineffectual" and should "be deemed to constitute an offer to the remaining shareholders to sell" the shares under the agreement's involuntary transfer provision. In January 2023 the Levins sent notices of election to purchase the trust's shares under that provision.

The Clapkins disputed the Levins' interpretation of the buy-sell agreement, arguing the agreement permitted "unlimited transfer of shares to the children of shareholders." They asserted that, in executing the buy-sell agreement, Sheila, Michael, and Ronald intended "to ensure that ownership and control of JLR would remain within the family" and that they "did not seek to prevent . . . shareholders from transferring shares among themselves, or their shareholders from passing on their shares to their children."

In February 2023 the Levins held an annual shareholders' meeting; the Clapkins objected on the ground "JLR had been in voluntary dissolution since November 2022." The Levins and the Clapkins brought separate ballots and held competing elections. Shana refused to count the Clapkins' ballots (which identified the Clapkins as cotrustees of the trust). She announced she, Tamara, and JLR's bookkeeper had been elected directors. On February 14, 2023 the Levins filed the sixth action between the parties—a complaint to validate the election of the three directors.

In May 2023 the trial court presiding over the six pending actions ruled the probate court had exclusive jurisdiction to determine the trustees of the trust. The trial court ordered the Clapkins to file a petition in probate court and stayed the six civil actions except for two issues unrelated to the identity of the trustees.

In June 2023 the Clapkins filed a petition in probate court (the eighth action)[3] for an order confirming the Clapkin children

---

[3] The seventh action was an interpleader action by JLR's insurer regarding the insurance proceeds for a warehouse that was damaged by fire.

6

became successor cotrustees of the trust as of November 2022. In January 2024 the probate court granted the Clapkins' ex parte application, suspended Sheila as trustee, and appointed the Clapkin children as interim successor cotrustees. In May 2024 the probate court granted the Clapkins' petition and ruled the Clapkin children were cotrustees of the trust regarding the JLR shares as of November 6, 2022, and for all purposes as of June 13, 2023 (the day Sheila's husband resigned as trustee). The Levins filed objections to the petition, but the probate court ruled the Levins were not interested parties in the trust. The Levins appealed from the probate court's orders. That appeal is pending.

D.    *The Levins File This Action Against the Clapkins*

But there's more. On January 29, 2024, after the probate court ruled the Clapkin children were interim successor cotrustees, the Clapkins asked the Levins to register the trust's shares in the names of the Clapkin children. The Levins filed this action against the Clapkins (number nine) the same day. The Levins alleged that the Clapkins breached the buy-sell agreement by transferring the voting power of the trust's shares from Sheila to the Clapkins and that the Levins had the right to buy the trust's shares under the buy-sell agreement's involuntary purchase provision. The Levins sought an order requiring the Clapkins to sell the trust's shares to the Levins, an injunction prohibiting the Clapkins from voting the trust's shares, and a constructive trust over the shares.

On January 10, 2024 Andrew served a notice of the annual shareholders' meeting for February 13, 2024 to occur in the

7

parking lot of JLR's principal place of business.[4]  The Levins, however, filed a statement with the Secretary of State in 2023 changing JLR's principal place of business to a new address, and on February 2, 2024 Tamara served a notice setting the annual shareholders' meeting at that location.  Both the Levins and the Clapkins filed ex parte applications seeking orders regarding the Clapkins' ability to vote the trust's shares at the annual meeting, which the trial court denied.  On February 13, 2024 the Levins and the Clapkins held separate annual shareholders meetings.  At the Clapkins' meeting the Clapkins elected Marci, Andrew, and Dina as directors.

E.    *The Clapkins File a Cross-complaint Against the Levins*

On March 14, 2024 the Clapkins filed a cross-complaint in this action against the Levins.  The Clapkins alleged:  "In their battle for control of JLR, the Levins have repeatedly contended that the Clapkins are not the successor trustees of the Trust, despite the Trust's directive otherwise, in a transparent attempt to block JLR's largest shareholder—the Trust—from having a vote in the selection of JLR's Board of Directors. . . .  [¶]  The crux of the instant action is a dispute as to who has the right to own or vote the shares of JLR held in the Trust, as those shares, in conjunction with the Clapkins' own shares, would indisputably give the Clapkins majority control of JLR."  The Clapkins asserted causes of action for violation of Corporations Code sections 700, subdivision (a), and 708, subdivision (a); breach of

---

[4]    The company headquarters where JLR held annual shareholders' meetings for more than a decade burned down in 2022.

fiduciary duty; declaratory relief; determination of officers and directors under Corporations Code section 709; and breach of contract. They sought, among other things, an injunction requiring the Levins and JLR to reregister the Trust's shares in the names of the Clapkin children as interim successor cotrustees; an injunction prohibiting the Levins from depriving the Clapkins of their right to vote their shares; and an order confirming the appointment of Marci, Dina, and Andrew as officers and directors of JLR.

F.    *The Trial Court Denies the Levins' Special Motion To Strike*

On May 15, 2024 the Levins filed a special motion to strike, in whole or in part, the Clapkins' causes of action for violation of Corporations Code sections 700, subdivision (a), and 708, subdivision (a); breach of fiduciary duty; declaratory relief; and determination of officers and directors under Corporations Code section 709. The Levins argued that the causes of action were "based on the Levins' 'refusal' to register the Trust's shares in the Clapkins' names," that the "registration and voting of the Trust's shares [were] squarely in dispute" in five pending actions, and that the Clapkins' cross-complaint was based on the Levins' filing of their complaint and other litigation activity. In their opposition to the Levins' motion, the Clapkins requested attorneys' fees under section 425.16, subdivision (c).

The trial court denied the Levins' special motion to strike. The court ruled that the Clapkins' causes of action did not arise from protected activity and that the "controversy exists separate and apart from the preexisting litigation and concerns the parties' current rights and ability to vote in matters

9

concerning JLR." The court did not address the Clapkins' request for attorneys' fees. The Levins timely appealed from the order denying the special motion to strike. The Clapkins timely appealed from the (implied) order denying their request for attorneys' fees.

## DISCUSSION

A. *Section 425.16*

Section 425.16, subdivision (b)(1), states a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Section 425.16, subdivision (e), provides an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" and "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." "Section 425.16 'provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.'" (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 642; see *Zhang v. Jenevein* (2019) 31 Cal.App.5th 585, 592.)

10

Courts use a two-step process to evaluate special motions to strike under section 425.16.  "First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.'  [Citation.]  Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."'  [Citation.]  If the plaintiff cannot make this showing, the court will strike the claim."  (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009; see *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061; *Norman v. Ross* (2024) 101 Cal.App.5th 617, 646.)  We review de novo an order granting or denying a special motion to strike under section 425.16.  (*Bonni*, at p. 1009; *Norman*, at p. 646.)

>    B.    *The Trial Court Did Not Err in Denying the Levins' Special Motion To Strike*

>        1.    *Applicable Law*

A court may strike a cause of action "'only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability.'"  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884; see *Park v. Board of Trustees of California State University, supra*, 2 Cal.5th at p. 1063.)  The "'trial court should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity.'"  (*Park*, at p. 1065.)  A "claim does not 'arise from' protected activity simply because it was filed after, or because of, protected activity, or when protected activity merely provides evidentiary support or context for the claim."

(*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621; see *Park*, at p. 1063.) "Rather, the protected activity must 'supply elements of the challenged claim.'" (*Rand*, at p. 621; see *Park*, at p. 1063 ["courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability"].)

### 2. *The Clapkins' Causes of Action Do Not Arise from Protected Activity*

The Levins argue the Clapkins' causes of action arise from the Levins' protected petitioning activity of initiating lawsuits against, and opposing lawsuits by, the Clapkins. The Levins, however, did not show any of the Clapkins' causes of action arise from litigation activity.

In their first cause of action for violation of Corporations Code sections 700, subdivision (a), and 708, subdivision (a),[5] the Clapkins alleged that, even though the probate court appointed

---

[5]     Corporations Code section 700, subdivision (a), states: "Except as provided in Section 708 and except as may be otherwise provided in the articles, each outstanding share, regardless of class, shall be entitled to one vote on each matter submitted to a vote of shareholders." Corporations Code section 708, subdivision (a), states: "Except as provided in Sections 301.5 and 708.5, every shareholder complying with subdivision (b) and entitled to vote at any election of directors may cumulate such shareholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which the shareholder's shares are normally entitled, or distribute the shareholder's votes on the same principle among as many candidates as the shareholder thinks fit."

12

the Clapkin children as interim successor cotrustees of the trust, the Levins refused to register the trust's shares in the Clapkins' names, denying the Clapkins the right to vote the trust's shares. Similarly, in their second cause of action for breach of fiduciary duty[6] the Clapkins alleged: "The Levins' refusal to allow the Trust's shares to be registered in the name of the duly appointed interim successor trustees for the Trust, solely to benefit their own interests and to maintain unlawful control of JLR, is a grievous breach of the fiduciary duties owed by the Levins to the Trust and to the Clapkins." In both causes of action the Clapkins sought an order directing the Levins to "register the Trust's shares in the names of the Co-Trustees pursuant to the Probate Court's Order and enjoin the Levins and JLR from taking any action to deprive, limit or undermine the Trust's and Clapkins' rights as shareholders in JLR, including, but not limited to, the right to vote on all matters on which a shareholder is entitled to vote under California law or the JLR Bylaws."[7]

Regarding the Clapkins' third cause of action for declaratory relief, the Levins moved to strike the following allegations: "The Clapkins contend that: [¶] (a) the Levins, on

---

[6] "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) The Clapkins alleged the Levins, as officers, directors, and controlling shareholders of JLR, owed fiduciary duties to the trust and to the Clapkins.

[7] The Clapkins also alleged the Levins breached their fiduciary duties by refusing to disclose financial information regarding JLR, but the Levins did not move to strike those allegations.

13

behalf of JLR, are legally obligated to register the Trust's shares in the names of Cross-Complainants, as interim Co-Trustees of the Trust, pursuant to the Probate Court's Order. [¶] (b) Absent a temporary restraining order, preliminary injunction or final court order finding that the ownership or right to vote JLR shares is limited or has been transferred to another, the trustees of a trust that has owned the shares are entitled to vote those shares in JLR's elections irrespective of whether other parties have asserted claims to those shares" under the buy-sell agreement.

The first three causes of action are based on and arise from the Levins' unprotected activity in denying the Clapkins their right to vote the trust's shares at annual shareholders meetings in 2023 and 2024 by refusing to register the shares in the names of the Clapkin children as successor cotrustees. The Levins' litigation activities do not supply any element of these causes of action. (See *Rand Resources, LLC v. City of Carson*, *supra*, 6 Cal.5th at p. 621; *Park v. Board of Trustees of California State University*, *supra*, 2 Cal.5th at p. 1063.) In other words, even if there had been no previous litigation between the Clapkins and the Levins, the Clapkins could have asserted the same causes of action against the Levins based on the Levins' refusal to allow the Clapkin children to vote the trust's shares. (See *WasteXperts, Inc. v. Arakelian Enterprises, Inc.* (2024) 103 Cal.App.5th 652, 661 [if prelitigation communications "had contained no reference to legal action, express or implied, the disputed overlap between the parties' services would still exist"]; *Gotterba v. Travolta* (2014) 228 Cal.App.4th 35, 42 [if "the threats of litigation were removed from [the defendant's] demand letters, the same dispute would exist regarding the terms of the termination agreement"].)

14

In their fourth cause of action under Corporations Code section 709, subdivision (a), the Clapkins asked the court to find that the Clapkins' shareholder and board meetings on February 13, 2024 were valid, that the directors elected and the officers selected at those meetings were validly elected and selected, and that the Levins' competing meeting was invalid. The Levins moved to strike only one allegation from this cause of action: that the Levins were "estopped" from enforcing the requirement the Clapkins "appear in person to be denied the right to vote the Trust's shares" at the Levins' meeting because through "court arguments, pleadings and elsewhere, the Levins made clear that they would not let the Clapkin Children vote the Trust's shares at the Levin Meeting, and it was futile for the Clapkins to appear in person to be denied the right to vote the Trust's shares at the Levin meeting." The Levins argued "an essential element" of this cause of action was based on the Levins' statements in judicial proceedings. The Clapkins' reference to "court arguments" and "pleadings," however, does not supply an element of the cause of action. First, the Clapkins alleged the Levins communicated they would not let the Clapkins vote the trust's shares not only in court arguments and pleadings, but also "elsewhere." Second, Corporations Code section 709, subdivision (a), authorizes an action "by any shareholder or by any person who claims to have been denied the right to vote." The Clapkins are shareholders who claim to have been denied the right to vote. Attendance at the Levins' meeting is not an essential element of the cause of action under the statute.

The Levins argue the cross-complaint is based on the Levins' protected litigation activity because, "[w]ell before the Clapkins filed their Cross-Complaint in this action, the validity of

the Clapkins' attempt to register and vote the Trust's shares was already the subject of the parties' ongoing litigation." True, by the time the Clapkins filed their cross-complaint, the parties had been involved in multiple lawsuits over control of JLR for more than a year. But the "'mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of [section 425.16].'" (*Park v. Board of Trustees of California State University*, *supra*, 2 Cal.5th at p. 1063; see *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76-77.) Indeed, a compulsory cross-complaint always involves the "same transaction, occurrence, or series of transactions or occurrences" as the complaint. (§ 426.10, subd. (c); see *Joslin v. Third Laguna Hills Mutual* (2020) 49 Cal.App.5th 366, 372 ["a cross-complaint will ordinarily not be considered a SLAPP [strategic lawsuit against public participation] suit because a cross-complaint usually arises from the underlying dispute alleged in the complaint, and not out of the litigation process itself"]; *Kajima Engineering and Const., Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 934 [a "'compulsory cross-complaint on a "related cause of action" against the plaintiff [citation] would rarely, if ever, qualify as a SLAPP suit arising from petition activity'" because a "'SLAPP suit is not "related" to the transaction or occurrence which is the subject of the plaintiff's complaint, but arises out of the litigation process itself'"].)

Citing *Cordoba Corp. v. City of Industry* (2023) 87 Cal.App.5th 145, the Levins argue a cross-complaint can arise out of the litigation process. *Cordoba Corp.*, however, does not support the Levins' position. In that case a city sued a consultant for, among other things, subcontracting its work without

16

authorization, submitting false invoices, and conspiring with others to conceal the true facts.  (*Id.* at pp. 149-150.)  The consultant filed a cross-complaint against the city for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief, claiming the city breached a provision of its contract with the consultant precluding the city from raising any issue about an invoice more than 30 days after receipt.  (*Id.* at p. 152.)  The court in *Cordoba Corp.* affirmed the trial court's order granting the city's special motion to strike the contractor's cross-complaint under section 425.16, concluding the consultant's cross-complaint did "not target an underlying controversy that exists apart from the City's litigation.  There is no other dispute between them." (*Cordoba Corp.*, at p. 153.)  The court stated that, though the consultant sought a declaration addressing its duties under the contracts, the consultant no longer had any duties under the contracts, and the "only use of a declaration now would be to undermine the City's legal claims." (*Id.* at p. 154.)  Here, in contrast, the Clapkins' cross-complaint targets their underlying dispute with the Levins over control of the trust's shares, a dispute that existed before and apart from the Levins' litigation activities.

The Levins also rely on *Birkner v. Lam* (2007) 156 Cal.App.4th 275, but that case does not help them either.  In *Birkner* the defendant landlord served a termination notice on the plaintiff tenants so the landlord could move his mother into their apartment.  (*Id.* at p. 279.)  The tenants told the landlord that he could not evict them without violating the rent stabilization ordinance, but the landlord refused to rescind the notice.  After the landlord's mother died, however, the landlord rescinded it.  (*Ibid.*)  The tenants filed a complaint for wrongful

17

eviction and violation of the rent stabilization ordinance, and the landlord filed a special motion to strike.  (*Id.* at pp. 278, 280.) The court in *Birkner* held that, though the landlord did not file an unlawful detainer action, he would have, had his mother not died (*id.* at p. 280), and prosecuting an unlawful detainer action "indisputably is protected activity within the meaning of section 425.16." (*Birkner*, at p. 281.)  The court also stated that, "if the termination notice is a legal prerequisite for bringing an unlawful detainer action, as it is in this case [citations], service of such a notice does constitute activity in furtherance of the constitutionally protected right to petition." (*Id.* at p. 282.) Because the "'sole basis for liability'" was the landlord's service of an eviction notice and his refusal to rescind it after the tenants claimed the notice violated the rent stabilization ordinance, the tenants' complaint arose from the landlord's protected activity. (*Id.* at p. 283.)  The Levins contend the Clapkins' causes of action, like the tenants' complaint in *Birkner*, are based on "actions taken in connection with ongoing or anticipated litigation."  But as discussed, the Clapkins' causes of action arise from the Levins' refusal to allow the Clapkins to vote the trust's shares, not from the Levins' litigation activities or any pre-litigation activity analogous to serving a rental termination notice.

The Levins argue the Clapkins' cross-complaint "describes at length the various lawsuits that the Clapkins have filed to enforce their alleged right to vote the Trust's shares and that the Levins have filed to stop the Clapkins from voting the Trust's shares" and "repeatedly alleges that the Levins' legal position in the ongoing litigation is 'meritless.'"  But the Clapkins mentioned the Levins' litigation conduct to provide context for the dispute and as evidence of the alleged statutory violations and breaches

18

of fiduciary duty.  For example, the Clapkins alleged:  "Based on the Levins' filing of this action, their subsequent *ex parte* application, and their repeated failure to provide any response to the Clapkins' demands that the shares be reregistered in the Clapkin Children's names, it is clear that the Levins do not intend to let JLR register the Trust's shares in the names of the Clapkin Children."  "'If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application'" of section 425.16. (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594; see *WasteXperts, Inc. v. Arakelian Enterprises, Inc.*, *supra*, 103 Cal.App.5th at p. 661 [though the complaint mentioned protected prelitigation communications "'numerous' times," the "lawsuit [arose] from the dispute, not the communication"]; *Starr v. Ashbrook* (2023) 87 Cal.App.5th 999, 1020 [beneficiary's surcharge action against a trustee arose from the trustee's misuse and waste of trust money to fund litigation, not the trustee's protected activity in pursuing litigation]; *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 880 [litigation activities "would provide *evidence* of the alleged breaches of fiduciary duty, but the filing of these petitions was not necessary to establish this portion of the breach of fiduciary duty claim"].)

The Levins also rely on a letter counsel for the Clapkins sent counsel for the Levins a few days after the probate court appointed the Clapkin children as interim successor cotrustees and two weeks before the February 2024 annual shareholder meeting.  The Levins argue counsel's letter "demanded that the Levins' counsel 'reregister' the Trust's shares because the Clapkins claimed the Probate Court's Order required the Levins

19

to do so." The Levins contend the letter "admitted the very purpose of the Clapkins' demand to 'reregister' the Trust's shares was to end the litigation over the voting issue." But that is not what the letter said. In the letter counsel for the Clapkins stated he was writing "in connection with implications of the [probate court order] and the other steps needed to prepare for the February 13, 2024 annual shareholder meeting and election of JLR's directors" and stated counsel's desire "to ensure that the votes held in the Trust can be voted and counted in the February 13 election." Indeed, counsel for the Clapkins acknowledged the litigation would continue: Counsel stated that the Levins' interpretation of the buy-sell agreement was "nonsense and will ultimately be defeated on the merits," but that "it can have no bearing on the validity of the February 13, 2024 shareholder election." Counsel also stated the dispute regarding the interpretation of the buy-sell agreement "will be decided in arbitration pursuant to Section 17 of the Buy-Sell Agreement," but that the Clapkin children had "the right to vote their shares at the February 13, 2024 annual shareholder meeting, and in all other circumstances unless and until an arbitrator or court determines that the Levins have the right to buy those shares under the Buy-Sell Agreement."

The Levins also argue the Clapkins' cross-complaint arises from protected activity because it "repeatedly asks the trial court to 'enforce' the Probate Court Order." The Levins contend that they "actively dispute" the Clapkins' interpretation of the probate court order in pending litigation and that the Levins "engaged in protected petitioning activity when they refused to accede to the Clapkins' disputed interpretation of the Probate Court Order in the ongoing litigation." The Clapkins' allegations, however, are

20

not based on the Levins' litigation over the interpretation of the order. The Clapkins attached the probate court order to the cross-complaint and alleged "JLR, acting at the direction of the Levins, has refused to reregister the Trust's shares in the names of the Clapkins, despite the probate court's appointment of the Clapkins as interim successor trustees." In support of the request for injunctive relief on their causes of action for violation of Corporations Code sections 700 and 708 and for breach of fiduciary duty, the Clapkins alleged they "have a clear legal right to the relief requested and are likely to succeed on the merits in this matter because [they] seek to enforce the prior Order of the probate court." The Clapkins alleged the Levins violated their statutory and fiduciary duties by refusing to register the trust's shares in the names of the Clapkin children, which the Clapkins contended the probate court order required them to do. The Clapkins do not seek to prevent the Levins from disputing the meaning of the order or otherwise litigating the issue of who controls the trust's shares, in this action or in any of the (numerous) other pending actions. And the Levins continue to do just that: They appealed from the probate court's later order granting the Clapkins' petition for confirmation of successor trustee and finding the Clapkin children were cotrustees of the trust.

Similarly lacking in merit is the Levins' contention the cross-complaint asks the trial court "to 'enjoin' the Levins from continuing their ongoing litigation." The Levins base this contention on the Clapkins' request (in their causes of action for breach of fiduciary duty and for violation of Corporations Code sections 700 and 708) the trial court "enjoin the Levins and JLR from taking any action to deprive, limit or undermine the Trust's

21

and Clapkins' rights as shareholders in JLR, including, but not limited to, the right to vote on all matters on which a shareholder is entitled to vote under California law or the JLR Bylaws." Though the Clapkins' language may be broad, read in context it is clear the Clapkins seek to enjoin the Levins from preventing the Clapkins from voting the trust's shares, not to enjoin the Levins from litigating. For example, in their cause of action for violating Corporations Code sections 700 and 708 the Clapkins alleged the Levins have denied the Clapkins the right to vote the trust's shares on the ground the shares were not registered in the Clapkins' names, in contravention of Corporations Code section 702, subdivision (a), which provides "no trustee shall be entitled to vote shares held by such trustee without a transfer of such shares into the trustee's name."

The cross-complaint makes clear the Clapkins are not asking the trial court to enjoin the Levins from litigating against them through what the Clapkins refer to as "carve-outs." For example, the Clapkins alleged that, even if the Levins prevail in the litigation in the future, the Levins must register the trust's shares in the names of the Clapkin children and allow them to vote those shares "until and unless any adverse judgment might be entered." Similarly, the Clapkins alleged they are entitled to vote the trust's shares in JLR's elections absent "a temporary restraining order, preliminary injunction or final court order finding that the ownership or right to vote JLR shares is limited or has been transferred to another." Thus, the cross-complaint acknowledges a court may rule against the Clapkins in the pending litigation; it does not, as the Levins contend, "seek to compel the Levins to capitulate their legal position in the ongoing litigation." The cases the Levins cite, where plaintiffs sought to

22

prevent or stop defendants from suing them, are inapposite. (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [plaintiff "sought an injunction barring [the defendant] from filing a Proposition 65 enforcement action"]; *CKE Restaurants, Inc. v. Moore* (2008) 159 Cal.App.4th 262, 271 [plaintiff "threatened to sue [the defendants] unless they withdrew their" Proposition 65 notice].)[8]

> ### C.     *The Trial Court's Order Denying the Clapkins' Request for Attorneys' Fees Is Not Appealable*

The Clapkins argue the trial court erred in denying their request for attorneys' fees under section 425.16, subdivision (c), which requires the court to award attorneys' fees to a prevailing plaintiff if the court finds the special motion to strike "is frivolous or is solely intended to cause unnecessary delay." We do not have jurisdiction to hear the Clapkins' appeal.

An "appellate court generally lacks jurisdiction to decide an appeal from an order unless the order is one that is expressly made appealable by statute." (*Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643, 652; see *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696 [a "trial court's order is

---

[8]     The Levins also argue the Clapkins' causes of action could not arise from the Levins' failure to reregister the trust's shares because "the Clapkins had already purported to register the Trust's shares, and the parties were actively litigating the validity of that registration." However, as the Clapkins point out, "the Levins have denied the validity of the Clapkins' registration and further denied the Clapkins their ability to vote the Trust's shares on the basis that the shares were not registered in the Clapkins' names."

23

appealable when it is made so by statute"].)  Section 425.16, subdivision (i), states:  "An order granting or denying a special motion to strike shall be appealable under Section 904.1."[9] Neither section 425.16 nor section 904.1, however, authorizes an appeal from an order granting or denying a motion for attorneys' fees.

"When we interpret a statute, [o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning. . . .  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  [Citation.]  However, [i]f the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Gutierrez v. Tostado* (2025) 18 Cal.5th 222, 231, internal quotation marks omitted; see *Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)

In *Doe v. Luster* (2006) 145 Cal.App.4th 139 we held an order denying a motion for attorneys' fees filed by a plaintiff who successfully opposed a special motion to strike was not appealable.  (*Id.* at p. 142.)  We concluded the plain meaning of section 425.16, subdivision (i), which authorizes an appeal from an order granting or denying a special motion to strike, did not encompass a ruling on "an interlocutory order granting or denying attorney fees following the trial court's ruling on a

---

[9]     Section 904.1, subdivision (a)(13), in turn, provides an appeal may be taken from "an order granting or denying a special motion to strike under Section 425.16."

24

special motion to strike." (*Doe*, at p. 147.)  After reviewing the legislative history of section 425.16, we held:  "The Legislature's concern was that the inability to appeal immediately from the denial of a meritorious special motion to strike defeated the protective purpose of section 425.16.  No such similar purpose is served by permitting an immediate appeal from an interlocutory order granting or denying attorney fees following the trial court's ruling on a special motion to strike." (*Doe*, at p. 147.)

Though in *Doe v. Luster*, *supra*, 145 Cal.App.4th 139 we considered whether a separate order denying attorneys' fees to a plaintiff who successfully opposed a motion under section 425.16 was appealable, we also stated "[t]here similarly is no creditable argument that combining the two motions—one that results in an immediately appealable order; one that does not—somehow transforms the nonappealable order into one that is appealable." (*Doe*, at p. 150.)  We continue to follow *Doe* and decline to follow cases concluding that, where a party appeals from an order granting or denying a special motion to strike, section 425.16, subdivision (i), also confers appellate jurisdiction over an order granting or denying attorneys' fees.  (See, e.g., *Gumarang v. Braemer on Raymond, LLC* (2025) 110 Cal.App.5th 370, 387-388; *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 275.)  The problem with *Gumarang* and *Baharian-Mehr* is that the statutory language does not support their conclusion.  That it might be more efficient to consider appeals from both orders at the same time does not override plain statutory language making only one of the orders appealable.

## DISPOSITION

The order denying the special motion to strike is affirmed. The Clapkins' appeal from the order denying their request for attorneys' fees is dismissed. The Levins' motion to augment the record is granted. The Clapkins' request for judicial notice is denied. The Clapkins are to recover their costs on appeal.


SEGAL, Acting P. J.


We concur:



FEUER, J.



STONE, J.